# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

United States of America,

    Plaintiff,

  v.

Enrique Galindo,

    Defendant.

Case No. 2:19-cr-00215-APG-BNW-1

**REPORT AND RECOMMENDATION**

Presently before the Court is Defendant's motion to suppress (ECF No. 22), filed on May 15, 2020. The government responded on June 4, 2020 (ECF No. 28), and Defendant replied on June 11, 2020 (ECF No. 32). The Court held an evidentiary hearing on June 25, 2020. *See* ECF No. 40. The Court permitted the parties to file supplemental briefs, if necessary, by the following day based on cases the government provided at the end of the evidentiary hearing. *See id.* The defense filed such a supplement. ECF No. 41.

It is undisputed that on July 11, 2019, Mr. Galindo was detained by police under the mistaken belief that he was another person (Mr. Franco). While detained, police patted Mr. Galindo down and found a gun on his person. Given Mr. Galindo's prior felony convictions, he was charged with a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), which prohibit a person convicted of a felony from possessing a firearm. *See* ECF No. 1.

The question before the Court is whether law enforcement violated Mr. Galindo's rights under the Fourth Amendment of the United States Constitution and whether the Court should suppress the evidence resulting from this alleged violation. Specifically, the Court must answer the following three questions: (1) whether it was reasonable for police to believe Mr. Galindo was Mr. Franco; (2) whether the seizure in this case was tantamount to an arrest, requiring probable cause, or a *Terry*-stop, requiring reasonable suspicion; and lastly, (3) whether the applicable standard supporting the seizure was met.

The Court finds that it was reasonable for police to believe that Mr. Galindo was Mr. Franco and that Mr. Galindo was subject to a *de facto* arrest. The Court also finds that law enforcement had probable cause to effect that arrest. Accordingly, Mr. Galindo's Fourth Amendment rights were not violated, and this Court recommends that his motion to suppress be denied.

## **Background**

### I.    **Witness Testimony and Other Evidence**

Three witnesses testified at an evidentiary hearing: Special Agent (SA) James Gustaw from the Bureau of Tobacco, Alcohol, Firearms, and Explosives (ATF), Detective Joshua Costello from the Las Vegas Metropolitan Police Department (LVMPD), and Officer Edgar Nahum from LVMPD.

SA Gustaw testified first, as follows: He currently works for ATF. As part of his job, he works with LVMPD's Central Intelligence Unit (CIU) as a plain-clothes officer conducting surveillance and gathering intelligence. Audi Tr. at 9:00. On July 11, 2019, a confidential informant (CI) called SA Gustaw. The CI said that a man known as "Baby Huey" lived at 2650 Sherwood, apartment 7. The CI relayed that Baby Huey was a felon in possession of three firearms that he was looking to sell quickly. The CI described the three firearms and stated that he/she had seen the guns recently on a few occasions. He/she also relayed that Baby Huey was arrested a week or two ago for a firearms offense. The CI described Baby Huey as "short" with "a lot of tattoos." He/she also provided a picture of the car Baby Huey drove (a Lincoln LS), which depicted the car's license plate. SA Gustaw ran the license plate and discovered that the registered owner was Louis Franco. *Id.* at 10:28-10:45; 15:00-16:34; 16:50-17:38; 26:23-27:00; ECF No. 22-2 (Gustaw Report).

SA Gustaw then reached out to CIU to see if it could obtain a picture and criminal history of Mr. Franco. CIU's search confirmed that Mr. Franco was a convicted felon and that he had recently been arrested in late June for a firearms charge. Audio Tr. at 18:15-19:10. CIU also reported that there had been a domestic violence call to the police on July 8, 2019, from 2650

1   Sherwood, apartment 7. A woman called and said that her boyfriend pistol whipped her; Mr.

2   Franco was the suspect. *Id.* at 19:10-20:02; ECF No. 22-2 (Gustaw Report).

3            SA Gustaw testified that CIU was going to come up with a plan to deal with the

4   information they had about Mr. Franco. Audio Tr. at 20:13-20:37. SA Gustaw did not get an

5   arrest warrant for Mr. Franco or a search warrant for apartment 7 that day. *Id.* at 32:00-32:12;

6   32:30-32:47. Additionally, he did not do anything to confirm that Mr. Franco lived at 2650

7   Sherwood, apartment 7. *Id.* at 31:30-31:36.

8            Detective Costello from LVMPD testified next: Detective Costello is currently assigned to

9   CIU at LVMPD. *Id.* at 37:50. CIU is responsible for gathering information and working it into

10  intelligence for LVMPD. *Id.* at 39:23.

11           On July 11, 2019 (the same day the CI provided SA Gustaw with information about Mr.

12  Franco), Detective Costello was working in a covert capacity when he heard over the radio that

13  Baby Huey was going to be at 2650 Sherwood Street. Detective Costello was informed that Baby

14  Huey was Hispanic, 5'5, approximately 200 pounds, and that he had tattoos all over his head,

15  neck, and face.[1] The name "Louis Franco" was "put out" over the radio. Detective Costello was

16  also told that Mr. Franco was a convicted felon in possession of a firearm. *Id.* at 42:55; 1:04:33.

17           After Detective Costello received this information, he immediately made his way to the

18  alleyway on the south side of 2650 Sherwood. There, he saw a minivan parked in the alley and a

19  Hispanic male, 5'5, with tattoos all over his head and neck. Costello conveyed over the radio that

20  he believed their suspect was standing in front him based on the description of the suspect he

21  received over the radio. *Id.* at 44:20; 50:00. After looking at the suspect for about ten to fifteen

22  seconds, the suspect entered the driver's side of the van and a blonde-haired, white female entered

23  the passenger side. *Id.* at 44:20; 48:42.

24           The van then exited the alley and began driving. Detective Costello followed the van and

25  called out the van's route over the radio. *Id.* at 44:20; 53:30. Detective Costello testified that at

26  one point during their drive, the suspect did not make a complete stop when required and did not

27  _____

28           [1] Detective Costello's report, written the same evening, did not mention any face tattoos. *Id.* at
    1:05:43.

1   use his turn signal before turning. *Id.* at 44:20.[2] Detective Costello testified that in addition to

2   calling out the van's route, he contacted LVMPD marked gang enforcement units, so they could

3   conduct a traffic stop. *Id.* at 53:30.

4   　　　　While following the van and continuing to communicate over his radio, Detective Costello

5   received information that Mr. Franco had a white, blonde-haired girlfriend who might be with

6   him. This information bolstered Detective Costello's belief that he was following Mr. Franco,

7   because he observed a female matching that description enter the minivan with the suspect. *Id.* at

8   54:43-55:18.

9   　　　　Eventually, marked police cars stopped the van. Detective Costello did not participate in

10  the stop to maintain his covert status. *Id.* at 57:15.

11  　　　　LVMPD Officer Nahum testified next as follows: He currently works with LVMPD in the

12  gang enforcement team. *Id.* at 1:31:59-1:34:40. On the day in question, his unit received a call

13  from CIU that they needed a suspect to be stopped, so Officer Nahum's unit mobilized. *Id.* at

14  1:34:41- 1:35:10. While on the way to make the stop, information was relayed to Officer Nahum

15  that the subject was a Hispanic male with his entire head covered in tattoos, approximately 200

16  pounds, about 5'5, named Louis Franco. He was also told that Mr. Franco was a convicted felon

17  and had recently been arrested for a firearms offense. *Id.* at 1:36:05-1:36:52. Officer Nahum also

18  testified that his unit decided to do a felony traffic stop (as opposed to a traditional traffic stop),

19  because police had information that the suspect was possibly an armed felon (and LVMPD

20  officers prefer to conduct stops as safely as possible on the "off chance" that if suspects are

21  armed, stops can become dangerous). *Id.* at 1:38:50-1:39:27.

22  　　　　When the suspect's van was pulled over, there were fourteen police officers on scene—

23  twelve police officers on the ground and two in a helicopter. Officers ordered the suspect to turn

24

25  　　　　[2] The Court will not discuss this testimony further, as it is not material to the Court's analysis
    given the Court's ultimate finding that the police had probable cause to arrest Mr. Galindo irrespective of
26  whatever traffic violations may or may not have taken place. There was also testimony about the suspect
    stopping at a casino before ultimately being pulled over by police. The Court will also not discuss this
27  testimony in detail, as it is not material to the Court's analysis; although none of the reports included this
    information, the testimony in court is consistent with the notion that Mr. Galindo was being surveilled
28  during that time and that the person arrested was the same person who went into the casino.

off the car and get out of his van using a loudspeaker (as opposed to walking up to the side of his car like in a traditional traffic stop). At least six officers had their guns drawn and pointed at the suspect while he was ordered out of his vehicle. With guns pointed at him, the suspect was ordered to open his car door from the outside and not to face the officers. Police ordered him to put his hands in the air, to step away from his vehicle, and to turn in a complete circle until his back was to the officers again. Then, he was ordered to walk backwards towards the officers with his hands on his head.[3] The suspect was repeatedly told not to reach for anything. When he got to the officers, he was immediately handcuffed. He was then placed against the front of a police vehicle, where he was patted down. *Id.* at 1:42:10-1:43:41; 2:03:14; 2:12:00-2:12:32; Ex. C (video of stop); Ex. E (video of stop). Officer Nahum testified that while patting the suspect's pocket, he felt an item that he believed—based on his experience as an officer and the item's shape and contour—was a gun. Officer Nahum removed the item from the pocket and confirmed it was in fact a gun. Audio Tr. at 1:42:10-1:43:41.

At this time, Officer Nahum believed he was detaining Mr. Franco; the suspect fit the physical description he was given "to the 'T.'" However, the suspect identified himself as Mr. Galindo. Officer Nahum confirmed that the suspect was indeed Mr. Galindo by running a records check and looking at Mr. Galindo's mugshot. *Id.* at 1:44:33–1:45:40; 2:20:10–2:20:58. He also learned that Mr. Galindo was a convicted felon. *Id.* at 2:22:00.

## II.    The Parties' Arguments

Defendant argues that the gun found on Mr. Galindo should be suppressed for two reasons. *First*, Defendant argues it was not reasonable for the police to believe that Mr. Galindo was Mr. Franco. More specifically, Defendant argues that the police "lacked probable cause to believe that Mr. Galindo was Louis Franco." ECF No. 22 at 7. Defendant walks through the facts that police gathered from their CI and argues that none of them "contribute to probable cause." *See id.* Defendant's position is that seeing Mr. Galindo in the alley behind 2650 Sherwood does

---

[3] Mr. Galindo's passenger (the blonde, white female) was removed from the van in the same way. *See* Exs. C, E. After she was removed from the van, officers approached the van with guns drawn to make sure no one else was in the vehicle. Ex. E.

not help establish probable cause, because police did not see Mr. Galindo *leave apartment 7 or even leave the apartment complex*. *Id.* Defendant also argues that the fact that Mr. Galindo matched "a generalized description of Mr. Franco is insufficient to establish probable cause that he is Mr. Franco." *Id.* at 7-8. In addition, Defendant asserts that the fact that Mr. Galindo was with a white woman with blonde hair does not support probable cause. *Id.* at 8. Lastly, Defendant argues that the CI's tip cannot serve as the basis of probable cause because police made no effort to verify its reliability and did not obtain an arrest warrant or a search warrant before stopping Mr. Galindo. *Id.*

Defendant also argues that police ignored two facts suggesting Mr. Galindo was *not* Mr. Franco. *See id.* at 9. Specifically, Defendant argues that Mr. Franco lived at apartment 7 but police did not see Mr. Galindo leaving this apartment or the apartment complex. *Id.* Defendant also argues that Mr. Galindo was observed getting into a car that did not match the description that the CI gave police. *Id.* And, if police had run the plates of this vehicle, they would have discovered that it was registered to someone other than Mr. Franco. *Id.* Accordingly, Defendant argues that there was not probable cause to believe that Mr. Galindo was Mr. Franco.

*Second,* Defendant argues that the *Terry* frisk of Mr. Galindo was unlawful because there was no reason to believe he was armed. *See id.* at 10-13. Essentially, Defendant argues that even if police had reasonable suspicion to believe that *Mr. Franco* was armed, there was no reason to believe that Mr. Galindo was Mr. Franco. *Id.* at 12. And there was no reason to believe that Mr. Galindo was armed (e.g., no bulge in his clothing, etc.). *Id.* at 12. As such, the pat-down search of Mr. Galindo was unlawful. *Id.* at 13.

The government disagrees with the Defendant's analysis. Essentially, the government argues that police received a credible tip that Mr. Franco illegally possessed three firearms. ECF No. 28 at 1. When police arrived at the apartment complex where Mr. Franco lived, they saw Defendant, who matched the description of Mr. Franco and was in the company of a woman who fit the description of Mr. Franco's girlfriend. *Id.* Though Defendant turned out not to be Mr. Franco, the government argues that the officers made a reasonable mistake of fact. *Id.* The government further argues that the stop of Mr. Galindo was a *Terry* stop (requiring only

reasonable suspicion). *Id.* at 5-6. In any event, the government also argues that police had probable cause to make the stop. *Id.* at 6. Accordingly, the government concludes that the gun found on Mr. Galindo should not be suppressed. *Id.* at 16.

In reply, Defendant explains the difference between a *Terry* stop and an arrest and argues that Mr. Galindo was arrested. ECF No. 32 at 1-3. The Defendant argues that the ultimate question is whether, viewing all the circumstances together, a reasonable person would believe that they were under arrest. *Id.* at 2. Defendant argues that when he was told to exit his vehicle, he was under arrest, and the mere fact that officers did not say he was under arrest until after they located the gun in his pocket does not change the analysis. *See id.* at 4.

Defendant also argues that a valid arrest cannot be based on a reasonable mistake of fact about one's identity. *Id.* at 4-5. And, even if it could, it was not reasonable to believe that Mr. Galindo was Mr. Franco. *Id.* at 6. This is so because Mr. Galindo got into a vehicle that did not match the description of Mr. Franco's vehicle and, had officers run the plates, they would have seen that the vehicle was not registered to Mr. Franco. *Id.* Finally, Defendant reiterates his argument regarding why Mr. Galindo was not subject to a valid *Terry* stop and frisk. *Id.* at 8-9.

Defendant's supplemental brief, filed after the Court's evidentiary hearing, provides further argument regarding why Mr. Galindo was arrested and not subject to a *Terry* stop. *See* ECF No. 41.

## Analysis

The Fourth Amendment of the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. CONST. AMEND. IV.[4] When a person is seized by police because police believe that person is someone else, the validity of such seizure turns on two factors: (1) whether police reasonably believed the person they detained was the person they were seeking and (2) whether police met the applicable standard (probable cause or reasonable suspicion) to detain the person

---

[4] The Fourth Amendment is applicable to the states by the Fourteenth Amendment. *Terry v. Ohio*, 392 U.S. 1, 8 (1968).

1    they were seeking. *See Hill v. California*, 401 U.S. 797, 802 (1971) ("when the police have

2    probable cause to arrest one party, and when they reasonably mistake a second party for the first

3    party, then the arrest of the second party is a valid arrest."); *see also Sharp v. City of Orange*, 871

4    F.3d 901, 910 (9th Cir. 2017) (citing *Hill v. California*, 401 U.S. at 802).

5        Relatedly, under the Fourth Amendment, "there are two categories of police seizures."

6    *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995). The first is a *Terry* stop, which falls

7    short of an arrest and can be supported by an officer's "reasonable suspicion" that criminal

8    activity "may be afoot." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). The second category of seizure

9    is an arrest. *Id.* A warrantless arrest must be supported by probable cause to believe that the

10   arrestee has committed a crime. *Allen*, 73 F.3d at 236 (citing *Henry v. United States*, 361 U.S. 98,

11   1002 (1959)).

12   **I.    Mistaken Identity**

13       Regarding the first factor (mistaken identity), police must have a subjective, good-faith

14   belief that the person they are detaining is the person sought, and this belief must be objectively

15   reasonable. *See Sharp v. City of Orange*, 871 F.3d 901, 910 (9th Cir. 2017) ("In a case of

16   mistaken identity, 'the question is whether the arresting officers had a good faith, reasonable

17   belief that the arrestee was the subject of the warrant.'" (quoting *Rivera v. City of Los Angeles*,

18   745 F.3d 384, 389 (9th Cir. 2014)).

19   **II.    *Terry* Stops v. Arrests**

20       Determining the second factor (whether police met the applicable standard), requires the

21   Court to resolve whether police made a *Terry* stop (requiring reasonable suspicion) or an arrest

22   (requiring probable cause). In the Ninth Circuit, there is no bright-line rule for whether a stop is a

23   *Terry* stop or an arrest. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Rather, to

24   determine if a stop is a *Terry* stop or an arrest, courts look at the totality of the circumstances and

25   must consider two critical factors: (1) the intrusiveness of the stop and (2) the justification for the

26   use of such tactics. *Id.* (citing *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir.1990)).[5] The

27   _____

28       [5] Essentially, these factors balance the interests of the person being stopped (of not wanting to have the terrifying and humiliating experience of being stopped in an aggressive manner) against the

ultimate question is whether a reasonable, innocent person would have felt free to leave after a brief questioning. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013).

### A.    Intrusiveness of the Stop

When considering the intrusiveness of the stop, courts consider several facts. "[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Washington*, 98 F.3d at 1188. Police drawing their guns also greatly increases the intrusiveness of the stop. *Id.* If police physically restrict the subject's liberty, this increases the aggressiveness of the stop. *Id.* at 1189. The more police officers that are present, the more intrusive a stop may be. *See id.* at 1190.

Typically, drawing weapons, using handcuffs, and using other restraints will turn a stop into an arrest. *Id.* at 1187. "In fact, even markedly less intrusive police action has been held to constitute an arrest when the inherent danger of the situation does not justify the intrusive police action." *Id.*

### B.    The Justification for the Use of Intrusive Tactics

In some instances, intrusive police action will not turn a *Terry* stop into an arrest. Ninth Circuit caselaw makes clear that the use of especially intrusive means of effecting a *Terry* stop is allowed but only in special circumstances, such as

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur.

*Id.* at 1189; *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013) (providing same factors).

…

…

---

interests of police (in needing to conduct stops safely, even when they only have reasonable suspicion that crime is afoot). *Washington*, 98 F.3d at 1186-87.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.     Mr. Galindo's Stop

#### A.     Whether Police Reasonably Believed Mr. Galindo was Mr. Franco

As discussed above, whether it was reasonable for police to believe that Mr. Galindo was Mr. Franco depends on whether they had a subjective, good-faith belief that Mr. Galindo was Mr. Franco and whether this belief was objectively reasonable. *See Sharp v. City of Orange*, 871 F.3d 901, 910 (9th Cir. 2017).

The Court finds that police had a subjective, good-faith belief that Mr. Galindo was Mr. Franco. Detective Costello testified that when he arrived at 2650 Sherwood Street, he believed their suspect was standing in front of him based on the suspect matching the description he had of Mr. Franco. Audio Tr. at 44:20. Officer Nahum also testified that he believed he was detaining Mr. Franco, as the suspect fit the physical description he was given "to the 'T.'" *Id.* at 1:44:33–1:45:40. Also, after officers discovered that the suspect was not Mr. Franco, they notified Detective Costello. Detective Costello testified that when he heard this, he was so surprised that he pulled over and used his LVMPD computer to look at booking photographs of Mr. Franco and Mr. Galindo, as he sincerely believed that Mr. Galindo was lying about his identity. *Id.* at 57:40. The Court finds this testimony of these witnesses credible. Additionally, no evidence was introduced that any police officer did *not* believe that Mr. Galindo was Mr. Franco or had doubts about the arrested suspect's identity. Accordingly, the Court finds that police had a subjective, good-faith belief that Mr. Galindo was Mr. Franco.

The Court also finds that it was objectively reasonable for police to believe that Mr. Galindo was Mr. Franco. To determine whether it was objectively reasonable to believe that Mr. Galindo was Mr. Franco, the Court looks at what police knew about Mr. Franco, whether this information was reliable, and what police knew about Mr. Galindo before he was stopped.

By the time that police stopped Mr. Galindo, they had information that Mr. Franco was about 5'5, 200lbs, and that he was a Hispanic male with tattoos on his head and neck. Audio Tr. at 42:55; 1:04:33. They also had information that Mr. Franco had a girlfriend who was white and blonde. *Id.* at 54:43. And they believed that Mr. Franco lived at 2650 Sherwood, apartment 7 and

drove a Lincoln LS. *Id.* at 15:00–16:34; 17:39–17:54; 26:23–27:00. This information came from a CI, a DMV records check of the license plate on the Lincoln LS, and a CIU search of Mr. Franco.

The Court also finds the CI's tip was reliable. Courts consider several factors to determine the reliability of an informant's tip.

> First, a known informant's tip is thought to be more reliable than an anonymous informant's tip . . . Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant. Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information. Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source.

*United States v. Rowland*, 464 F.3d 899, 907–08 (9th Cir. 2006) (internal citations omitted). Here, the tip came from a known CI rather than an anonymous source. Audio Tr. at 15:00-16:34. While it was unclear whether the CI previously provided reliable information,[6] the CI provided information that police were able to confirm (namely, that the registered owner of the Lincoln LS was a convicted felon with a recent firearms offense who was relatively short with tattoos all over his head and neck). *Id.* at 15:00–16:34; 18:15–19:10; ECF No. 22-2 (Gustaw Report (indicating that CI told him Mr. Franco had tattoos all over his head and neck)); ECF No. 29 (picture of Mr. Franco). The CI also revealed the basis of his/her knowledge—he/she had previously seen the guns on a few recent occasions. Audio Tr. at 17:27-17:38; ECF No. 22-2 (Gustaw Report). The CI did not provide predictive information before Mr. Galindo was stopped.[7] Considering all these facts, the Court finds that the CI's tip was reliable.

---

[6] SA Gustaw testified about an unrelated incident in the 2650 Sherwood area where *a* CI gave information that led to an arrest. However, it was unclear from the testimony whether this information came from the same CI or a different CI. *Id.* at 10:50.

[7] SA Gustaw testified that after Mr. Galindo was stopped, agents engaged in an undercover purchase of guns from Mr. Franco and the guns matched the description that the CI gave. Audio Tr. at 21:50–23:08. Accordingly, the CI did give predictive information. But the Court does not consider this in its analysis, as police did not confirm this until after Mr. Galindo was stopped.

1  The Court also finds, as reliable, the information that police obtained by running a DMV

2  records check of the license plate on the Lincoln LS and a CIU search of Mr. Franco; there has

3  been no suggestion that these records were unreliable.

4  Accordingly, to summarize, before stopping Mr. Galindo, police had reliable information

5  that Mr. Franco was a Hispanic male with tattoos all over his head and neck, about 5'5, and 200

6  pounds. They knew he had several prior felony convictions and was trying to sell three firearms.

7  They also had information that Mr. Franco had a girlfriend who was white and blonde. And they

8  believed that he lived at 2650 Sherwood, apartment 7 and drove a Lincoln LS.

9  By the time police arrested Mr. Galindo, they observed that he was roughly 5'5 and 200

10  pounds, Hispanic, male, with tattoos all over his head and neck. Audio Tr. at 44:20. He also had a

11  white female with blonde hair with him. *Id.* And he was seen getting into a vehicle in an alley

12  behind 2650 Sherwood (where the 2650 Sherwood address is clearly visible on the exterior of the

13  building facing the alley). *Id.*; *see also* Ex. 4 (picture showing this address in alleyway).

14  None of the traits or facts that police knew about Mr. Franco *alone* would make it

15  reasonable to believe that Mr. Galindo was Mr. Franco. Afterall, there are lots of Hispanic males

16  fitting that height and weight, lots of men with blonde girlfriends, lots of people with tattoos, etc.

17  However, all these characteristics taken together, and the fact that Mr. Galindo was spotted in an

18  alley directly adjacent to the location where Mr. Franco allegedly lived, allows the Court to find

19  that it was objectively reasonable to believe that Mr. Galindo was Mr. Franco.[8] The Fourth

20  Amendment does not require police to be one-hundred percent certain that Mr. Galindo was Mr.

21  Franco. Rather, their belief merely had to be *reasonable*, and it was.

22

23  _____

24  [8] Detective Costello was asked about the prevalence of tattoos. Audio Tr. at 1:09:15. Costello testified that in the area of 2650 Sherwood, it's not uncommon to see people with tattoos and that tattoos are "common in society today." Costello further testified that he did not believe persons in the 2650

25  Sherwood area were more heavily tattooed than anywhere else and that it would not be unusual to see a heavily tattooed person in Summerlin. Finally, Costello testified that tattoos are extremely mainstream

26  now and it is common to see head, neck, and face tattoos "everywhere in society." *Id.* at 1:10:35.

27  Even if the Court were to credit all of Costello's testimony about the prevalence of tattoos, it was still reasonable for police to believe that Mr. Franco was Mr. Galindo based on the number of other similar

28  traits and attendant circumstances.

The defense suggests that other factors made it unreasonable for police to believe that Mr. Galindo was Mr. Franco. Specifically, the defense suggests that the fact that police did not see Mr. Galindo leave apartment 7 makes it unreasonable to believe that Mr. Galindo was Mr. Franco. While police did not see Mr. Galindo exit apartment number 7, this did not make it unreasonable to believe that Mr. Galindo was Mr. Franco. Seeing the suspect leave apartment 7 would have made it more likely that he was Mr. Franco, but *not* seeing him leave apartment 7 did not vitiate the reasonableness of the government's belief that Mr. Galindo was Mr. Franco. Additionally, at this apartment complex, the apartment has interior doors such that the numbering cannot be seen from outside the apartment building. Audio Tr. at 1:28:37. Therefore, police would not have seen Mr. Franco leave apartment 7.

The defense also suggests that the fact that Mr. Galindo got into a van rather than a Lincoln LS made it unreasonable to believe that Mr. Galindo was Mr. Franco. The Court disagrees. As Officer Nahum and Detective Costello testified, in their experience, people often drive other people's vehicles. *Id.* at 1:00:15; 2:04:58. And while the police could have run the license plate of Mr. Galindo's van and discovered it was not registered to Mr. Franco, Officer Nahum testified this would not have changed the police's actions. *Id.* at 2:24:44–2:25:05. It does not change the Court's analysis either, as the Court finds as credible Officer Nahum's and Detective Costello's testimony that people often drive other peoples' cars. (In other words, Mr. Franco could have been driving the van despite not being the van's registered owner.) Accordingly, the fact that Mr. Galindo entered a vehicle that did not match Mr. Franco's car did not make it *unreasonable* to believe that Mr. Galindo was Mr. Franco, considering all the other similarities between the two men (and that this was the only factor that did not match the CI's tip).

The cases cited by Defendant for the proposition that it was unreasonable to believe that Mr. Galindo was Mr. Franco are distinguishable from this case.

Defendant cites *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) for the proposition that mere general resemblance to a suspect and proximity to criminal activity do not create probable cause. *See* ECF No. 22 at 4-6. However, as explained below, rather than supporting

1  Defendant's position, *Lopez* provides additional authority for the proposition that it was

2  reasonable for police to believe that Mr. Galindo was Mr. Franco.

3      In *Lopez*, a man pulled a gun on police officers, attempted to shoot, and then got in his car

4  and drove away. *Lopez*, 482 F.3d at 1069. Police had an accurate description of his car and its

5  license plate, as well as a general description of the suspect (adult, male, Hispanic, in his 20s,

6  thin, tall, wearing a white sweater). *Id.* at 1069-70. Later in the day, the getaway car was spotted

7  in a parking lot. *Id.* at 1070. Several hours later, a car drove up to the getaway car. *Id.* A female

8  got out of the car, entered the getaway car, and both cars drove away. *Id.* The driver of the second

9  car was a Hispanic male, approximately twenty years old. *Id.* Police stopped both cars and

10 arrested the man in the second car (Mr. Lopez), because he somewhat fit the description of the

11 suspect. *Id.* at 1070-71. Eventually, police found drugs in Mr. Lopez's car but discovered he was

12 *not* the suspect they were looking for. *Id.* at 1071. Mr. Lopez moved to suppress the evidence

13 found in his car.

14     The Ninth Circuit held that by the time police searched Mr. Lopez's car, probable cause to

15 detain him as the suspect had dissipated. *Id.* at 1072. The court noted that while Mr. Lopez

16 matched some of the descriptors of the suspect (male, Hispanic, in his twenties), he did not match

17 the more specific aspects of the description: Mr. Lopez was short and the suspect was tall; Mr.

18 Lopez was wearing glasses but the suspect was not; Mr. Lopez was not wearing a sweater but the

19 suspect was. *Id.* at 1073. After stopping Mr. Lopez, police also discovered that he was not the

20 registered owner of the getaway car. *Id.* at 1075. *Critically*, *however,* the Ninth Circuit held that

21 the arrest of Mr. Lopez (based on his general description and connection to the getaway car) was

22 initially lawful. *Id.* at 1072 ("We find that the government's first theory, *while initially adequate*

23 *to support Lopez's arrest,* was no longer viable by the time Lopez consented to the search of his

24 car, since by then the police had acquired additional information that undercut probable cause.")

25 (emphasis added).

26     Accordingly, *Lopez* supports the idea that it was reasonable to believe that Mr. Galindo

27 was Mr. Franco. This is so because Mr. Galindo fit a more specific description of Mr. Franco than

28 Mr. Lopez did of the suspect. The commonalities between Mr. Lopez and the suspect were

limited to being male, Hispanic, in their twenties, and near a relevant car. The commonalities between Mr. Galindo and Mr. Franco included that both were 5'5, 200 pounds, male, and Hispanic with tattoos covering their head and neck, in the area of a relevant address (2650 Sherwood) and in the company of a white, blonde female. Accordingly, *Lopez* does not detract from the finding that it was reasonable to believe that Mr. Galindo was Mr. Franco; it supports it.

Defendant also cites *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002), *opinion amended on denial of reh'g,* 334 F.3d 795 (9th Cir. 2003) for the proposition that mere resemblance to a general description is not enough to establish probable cause. ECF No. 22 at 4. While this is a correct statement of law from *Grant*, the facts of *Grant* do not aid Defendant's argument. In *Grant*, police argued they had probable cause to arrest the defendant because he generally fit the description of the suspect they were looking for. *Grant*, 315 F.3d at 1088. The Ninth Circuit disagreed, explaining that police only had general descriptions of the suspect from multiple victims that often conflicted. *Id.* (explaining that victims' descriptions ranged from describing their assailant as anywhere from 5'7 to 5'11; ranging from tanned skin to dark skin; and perceived as Hispanic or Caucasian). Here, Mr. Galindo fit a much more specific description of Mr. Franco, and there was no conflicting information about Mr. Franco's appearance. Accordingly, *Grant* is distinguishable and does not support Defendant's argument.

The same is true of *United States v. Delgadillo-Velasquez*, 856 F.2d 1292 (9th Cir. 1988), also cited by Defendant. ECF No. 22 at 5-7. In *Delgadillo-Velasquez*, an informant gave police a tip that that Ricardo Alvarado-Coronado (Alvarado), a known fugitive wanted for drug smuggling, lived at 1330 Wilmington Blvd., apartment number 3 and recently told the informant that he had cocaine for sale. *Id.* at 1294. Police looked up Alvarado and found a physical description of him and a 20-year old photo. *Id.* Police then went to this apartment and began surveillance. *Id.* They saw a Hispanic man leave apartment 3 but could not determine if this person was Alvarado based on the physical description or photo they had of Alvarado. *Id.* Police then watched two men arrive and meet the defendant with briefcases. *Id.* After watching all three men enter the apartment and leave, police arrested them (believing they were intercepting a drug sale). *Id.* Police then searched the apartment and discovered drugs. *Id.* at 1294-95. Police

1    subsequently learned that the Hispanic man they saw exiting apartment three was *not* Alvarado,

2    and the defendant moved to suppress the evidence resulting from the search. *See id.*

3         The district court denied defendant's motion to suppress, and the Ninth Circuit reversed.

4    *See id.* at 1295. Critically, the Ninth Circuit held that police had "probable cause to arrest

5    Alvarado. But they had no reason to believe that they were at Alvarado's apartment or that the

6    man they saw was Alvarado." *Id.* at 1297. Police only believed they were arresting Alvarado

7    because the informant said he lived at apartment three, and police saw the defendant leave this

8    apartment. *Id.* However, both the district court and the Ninth Circuit found that, for a variety of

9    reasons, the informant's tip was unreliable. *Id.* at 1297-98. Thus, it was not reasonable for police

10   to believe that Alvarado lived at apartment 3. And, as previously noted, police did not identify the

11   defendant as matching the description or photograph of Alvarado.

12        By contrast, in this case and as discussed above, the CI's tip was reliable. Additionally,

13   police had reason to believe that they were looking at Mr. Franco when they found Mr. Galindo

14   behind 2650 Sherwood. Again, Mr. Franco was described as Hispanic, male, 5'5, 200 pounds,

15   with tattoos all over his head and neck and as having a white, blonde girlfriend. Mr. Galindo fit

16   every one of these descriptors and was found near the apartment where Mr. Franco was believed

17   to live. Accordingly, unlike in *Delgadillo-Velasquez*, police here had "reason to believe that . . .

18   the man they saw was" Mr. Franco. *See id.* at 1297.

19        Accordingly, as already noted, the Court finds that it was reasonable for police to believe

20   that Mr. Galindo was Mr. Franco.

21        **B.    Whether Police Subjected Mr. Galindo to a *Terry* Stop or an Arrest**

22        To determine if Mr. Galindo was subject to a *Terry* stop or an arrest, the Court must look

23   at the totality of the circumstances and consider (1) the intrusiveness of the stop and (2) the

24   justification for the use of such tactics. *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir.

25   1996). Again, the ultimate question is whether a reasonable, innocent person would have felt free

26   to leave after a brief questioning. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176

27   (9th Cir. 2013).

28

Here, police used extremely intrusive tactics to stop Mr. Galindo. Fourteen officers stopped Mr. Galindo (twelve on the ground and two in a helicopter above). Officers ordered Mr. Galindo to turn off the car and get out of his van using a loudspeaker. At least six officers had their guns drawn and pointed at Mr. Galindo while he was ordered out of his vehicle. Before he even exited his van, officers began telling him what to do with his body (e.g., to open the car from the outside, put his hands in the air, turn in a circle, walk backwards towards officers, and not reach for anything). When he got to the officers, he was immediately handcuffed. He was then placed against the front of a police vehicle, where he was patted down. *Id.* at 1:42:10–1:43:41; 2:03:14; 2:12:00–2:12:32; Ex. C (video of stop); Ex. E (video of stop). Accordingly, Mr. Galindo's stop was very intrusive.

As discussed above, this type of police conduct is not allowed in *Terry* stops unless such intrusive methods are justified. *See Washington*, 98 F.3d at 1187 (explaining that typically, drawing weapons, using handcuffs, and using other restraints will turn a stop into an arrest). This type of intrusiveness is justified only when: the suspect is uncooperative; the suspect acts in a way that raises the reasonable possibility of flight or danger; police have information that the suspect is currently armed; the stop closely follows a violent crime; or the police have information that a violent crime is about to occur. *Id.* at 1189.

Here, the intrusiveness of the stop was not justified when analyzed in the context of a *Terry* stop. There was no evidence introduced to suggest that Mr. Franco, the individual the police believed they were stopping, would be uncooperative or that he might flee or cause danger. Neither was there evidence that the stop followed a violent crime or that a violent crime was about to occur.

Additionally, the Court finds that police did not have sufficient evidence that Mr. Franco was currently armed to justify the intrusiveness of their stop. While there was testimony that he was an "armed" felon or possibly armed, no evidence was offered regarding why officers believed Mr. Franco was armed at that time (e.g., the CI never told Agent Gustaw that Mr. Franco was currently armed, always armed, leaving his apartment to sell the guns, etc.). Rather, the evidence suggested that police assumed, for safety purposes, that Mr. Franco might be armed.

1    Audio Tr. at 1:38:50–1:39:27 (police had information the suspect was "possibly [an] armed

2    felon"); 2:14:12 (Officer Nahum believed the suspect "might be armed and dangerous"); 2:25:37–

3    2:26:00 (Officer Nahum did not know that the suspect had a gun on him until he patted him

4    down). Additionally, there was no evidence offered that anyone saw a gun on the suspect (who

5    turned out to be Mr. Galindo) or saw anything else that suggested he was armed (e.g., a bulge in

6    the suspect's clothing or the suspect reaching for his waistband). Accordingly, the Court cannot

7    find that police had sufficient information that the suspect was armed to justify the intrusiveness

8    of their stop.

9        Additionally, the Court finds that a reasonable, innocent person in the same circumstances

10    as Mr. Galindo would not have felt free to leave after a brief questioning. The Court finds that the

11    intrusiveness of the stop—with fourteen police officers and a helicopter, six officers pointing

12    guns at the suspect, and the suspect's every movement being controlled by police—would make a

13    reasonable person feel that they would not be free to leave after a brief questioning. Also, while

14    the focus of this inquiry is on the perspective of the person being stopped rather than on police

15    (*see Johnson*, 724 F.3d at 1176), here, Officer Nahum's testimony bolsters this conclusion. He

16    testified that from the second Mr. Galindo was pulled over, he was in police custody and was not

17    free to leave. Audio Tr. at 2:16:00-2:17:10. Accordingly, the Court finds that Mr. Galindo was

18    subject to a *de facto* arrest when he was pulled over.

19        The Court reviewed but is unpersuaded by the cases cited by the government in its closing

20    argument for the proposition that Mr. Galindo was only subjected to a *Terry* stop. Both are

21    distinguishable from the facts of this case. Specifically, the government cited *United States v.*

22    *Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) and *United States v. Miles*, 247 F.3d 1009 (9th Cir.

23    2001). In both cases, the Ninth Circuit held that the defendants were only subjected to a *Terry*

24    stop (and not an arrest) when police pointed their guns at them, ordered them to kneel, and

25    handcuffed them before patting them down. *Edwards*, 761 F.3d at 981-82; *Miles*, 247 F.3d at

26    1012-13. Unlike in this case, however, police in *Edwards* and *Miles* were justified in using this

27    level of intrusiveness during a *Terry* stop because they had information that the suspects were

28    potentially armed and that a violent crime had just occurred. *Edwards*, 761 F.3d at 982 (suspect

"was the only person in the vicinity of the liquor store who fairly matched the description of a man who reportedly had been shooting at passing cars just minutes before police arrived"); *Miles*, 247 F.3d at 1013 (explaining that minutes before spotting Miles, officers received a report of shots fired at a residence, and Miles was the only person officers found who fit the description of the shooter). Here, again, there was no convincing evidence that the suspect was currently armed or that a violent crime had just occurred. Accordingly, *Edwards* and *Miles* are distinguishable and do not change the Court's analysis.

### C.    Whether Police Had Probable Cause

Having concluded that it was reasonable to believe that Mr. Galindo was Mr. Franco and that Mr. Galindo was subject to a *de facto* arrest, the Court must next determine if police had probable cause to arrest Mr. Franco. The inquiry focuses on Mr. Franco rather than Mr. Galindo because "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *See Hill v. California*, 401 U.S. 797, 802 (1971); *Sharp v. City of Orange*, 871 F.3d 901, 910 (9th Cir. 2017).

"Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed . . . an offense." *Crowe v. City of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (*citing Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir.1990)). The Court must look at all the facts known by arresting officers to determine if a prudent person would have concluded that there was a fair probability that the defendant committed a crime. *Id.* When considering whether an informant's tip helps establish probable cause, the court must consider the informant's reliability and their basis of knowledge. *United States v. Sarabia,* 446 F. App'x 48, 49 (9th Cir. 2011); *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006).

Here, the Court finds that the police had probable cause to arrest Mr. Franco. As discussed above, when police arrested Mr. Galindo, they had reliable information from a CI that Mr. Franco had committed the crime of illegally possessing three guns. The Court also finds that the CI's tip, combined with the information police learned by running a background check on Mr. Franco,

would lead a prudent person to believe that there was a fair probability that Mr. Franco illegally possessed firearms. From these sources, police knew that (1) Mr. Franco was a person prohibited from possessing a firearm; (2) he was arrested in late June for a firearms offense despite being a person prohibited from possessing a firearm; (3) there was a report only three days prior (on July 8, 2020) to police that he pistol whipped his girlfriend, suggesting he possessed a firearm at that time; and (4) a reliable CI reported that he/she had personally and recently seen the guns Mr. Franco allegedly owned on a few occasions. All these facts would lead a prudent person to believe that there was a fair probability that Mr. Franco illegally owned firearms on July 11, 2020.

Accordingly, the Court finds that police had probable cause to arrest Mr. Franco. And "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill*, 401 U.S. at 802. As previously discussed, police reasonably mistook Mr. Galindo for Mr. Franco. Thus, police validly arrested Mr. Galindo.

### D.    Whether the Search of Mr. Galindo was Lawful

Police patted Mr. Galindo down after arresting him. During this pat-down, police discovered a gun in his pocket. This pat-down was a lawful search incident to arrest. *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991) ("When making a lawful arrest, police may conduct a warrantless search of the area within the arrestee's immediate control, that is, 'the area from within which he might gain possession of a weapon or destructible evidence.'"). Accordingly, police lawfully searched Mr. Galindo and lawfully discovered the gun in his pocket.

…

…

…

…

…

…

…

1

**<u>Conclusion</u>**

2      IT IS THEREFORE RECOMMENDED that defendant's motion to suppress (ECF No.

3   22) be DENIED.

4

**NOTICE**

5      This report and recommendation is submitted to the United States district judge assigned

6   to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation

7   may file a written objection supported by points and authorities within fourteen days of being

8   served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely

9   objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153,

10  1157 (9th Cir. 1991).

11

12      DATED: August 5, 2020.

13

14                                              _____

15                                              BRENDA WEKSLER
                                                UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28